1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SAP KRAY,

               Petitioner,

      v.

BELINDA STEWART, *et al.*,

               Respondents.

Case No. C06-5521 RBL/KLS

REPORT AND
RECOMMENDATION

**NOTED FOR:**
**February 29, 2008**

Petitioner, Sap Kray, filed a 28 U.S.C. § 2254 habeas corpus petition related to his April 1999 conviction for first degree murder. (Dkt. # 1). Mr. Kray raises seven grounds for relief in his habeas petition. Respondent has answered (Dkt. # 14) and submitted the relevant record of state court proceedings. (Dkt. # 15). Mr. Kray filed a reply, traverse and moved for an evidentiary hearing, discovery, the appointment of counsel, and expert witnesses. (Dkt. # 19, 20). With the Court's permission, Mr. Kray also submitted the full copy of the trial transcript. (Dkt. # 31).

The Court has considered the record relevant to the grounds raised in the petition. For the reasons discussed herein, it is recommended that Mr. Kray's habeas petition be denied and this action dismissed.

REPORT AND RECOMMENDATION- 1

# I.  FACTUAL BACKGROUND [1]

The Washington State Court of Appeals provided the following summary of the facts surrounding Mr. Kray's conviction:

## A.  ASSAULT OF ESTRANGED WIFE

Kray and his wife, Samuan Srip, separated in the mid-1980s. Thereafter, Kray visited Srip's Tacoma home two to three days a week, spending time with her and their two teenaged children, Veasna and Chandara.

On the evening of August 27, 1997, Kray arrived at Srip's residence armed with an assault rifle. Srip was preparing to leave for her job as a housekeeper at Emerald Downs Racetrack, but Kray wanted her to stay at her home with him. They argued about Srip's pending departure.

Holding the rifle, Kray tried to keep Srip from leaving. Two teenagers at the house, Ra Lan and Song Suong, tried to hold Kray back to prevent him from following Srip out of the house. But Kray went outside, threatened to shoot the tires on Srip's car, and then pointed the rifle at her tires as she pulled out of the driveway. Srip quickly backed out and drove away.

Srip appeared frightened when she arrived at Emerald Downs. She told her supervisor, Khean Phoung, that her husband had pointed a gun at her because he did not want her to come to work. Early the next morning, August 28 (about five hours after Kray's assault with the rifle), Srip also told Emerald Downs security director Harold Caldwell that Kray had pointed a rifle at her as she backed out of the driveway on her way to work the previous evening.

Kray drove to Emerald Downs, contacted security personnel, and asked to speak with his wife. Kray and Srip had a brief conversation.  Srip returned to work, and Kray drove away in a van.

An hour or two later, Kray returned to Emerald Downs a second time and angrily demanded to see his wife again. Srip's supervisor ran to a security officer

---

[1]In a federal habeas proceeding, state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Jeffers v. Wood*, 114 F.3d 1484, 1499-1500 (9th Cir. 1997). Although Mr. Kray alleges that Respondent has not specifically denied or disputed his factual allegations, Rule 5 governing Section 2254 cases requires the answer to respond to the allegations of the petition. *Williams v. Calderon*, 52 F.3d 1465, 1483 (9th Cir. 1995) (citing Rule 5 and Advisory Committee Notes to Rule 5).  *Bland v. California Dept. Of Corrections*, 20 F.3d 1469, 1474 (9th Cir. 1994) and *Dickens v. Jones*, 203 F.Supp.2d 354, 360 (D. Mich. 2002), relied on by Mr. Kray, do not require the Court to accept as true allegations of what the defense would have done had the circumstances at trial been different. (*See*, Dkt. 20, p. 15).  Rather, these cases provide that the Court may adopt factual allegations not disputed by the Respondent when they are not inconsistent with the record.

REPORT AND RECOMMENDATION- 2

and told him that Kray might have a gun and might have been drinking. Another security officer saw Kray reach into his van and thought that Kray might be reaching for a weapon. A third security officer called the Auburn Police.

### B. AUBURN POLICE SUMMONED TO EMERALD DOWNS

When the Auburn Police arrived, Officer Worthington ordered Kray to step away from his van, but Kray refused. Officers at the scene thought that they heard Kray load his gun. Kray said to the police, (1) "You want to kill me, don't you?" Report of Proceedings (RP) at 505; (2) that his life was not worth anything; and (3) that he did not care if he died that night. Kray then raised his rifle. Police immediately ordered Kray to put the weapon down. Kray complied.

With some urgency, Kray asked to be allowed to leave. Sergeant Riley, the officer in charge, ultimately determined that Kray had not committed any crime in police presence for which they could arrest him, so he allowed Kray to leave in his van at about 1:05 A.M.

Nonetheless, Riley asked dispatch to advise the state patrol and bordering agencies about the confrontation, including "that there may be a weapon in the vehicle; that [Kray] could possibly be intoxicated; [and] that he was angry." RP at 869. The Auburn Police issued an ACB (all-call broadcast) (1) informing police that Kray posed a safety risk for police officers; (2) identifying Kray's van by type and license number; (3) noting that there was an armed, Asian male inside; and (4) listing 1026 East 57th Tacoma (Srip's residence), as Kray's possible destination.

### C. KRAY RETURNS TO SRIP'S HOUSE

The Auburn Police's hunch proved correct. Kray returned to Srip's Tacoma residence, where several of his son's teenaged friends were visiting. Kray asked his son, Veasna, to go to Emerald Downs to bring Srip home. Kray then retired to the bedroom and went to sleep.

As requested, Veasna and his friend, Ra Lan, went to Emerald Downs and asked to see Srip. Srip spoke with Tacoma Police Sergeant Martin on the telephone and confirmed the earlier assault at her residence. Martin asked to meet her in person to interview her more carefully. When Srip finished her Emerald Downs work shift at approximately 6:00 A.M., she, Veasna, and Ra Lan went to a Tacoma police station and met with Sergeant Thrall.

After speaking with Srip, the police concluded that the teenagers were not in danger. Thrall decided that Veasna and Lan should return to Srip's home and call the police from the house to tell them what was going on. Thrall initially planned simply to go to Srip's house to arrest Kray, but another sergeant, a former SWAT commander, suggested using a SWAT unit because of the "situation," including the report that Kray had an AK-47. Accordingly, the police requested the Tacoma Police SWAT team.

Meanwhile, at 3:00 A.M., a Tacoma police officer drove by Srip's house and

REPORT AND RECOMMENDATION- 3

reported to Sergeant Martin that "[t]he van was parked at the front of the house and [the officer] could see no activity whatsoever." RP at 1338. Martin and another officer initially went to Srip's residence to do a welfare check but, because of the potential danger, the police subsequently called it off.

At about 7:00 A.M., Veasna and Lan returned home and called police to report that Kray was in a bedroom and their friends were watching television.

Between 8:15 and 8:30 A.M., Kray's younger brother, Ting, responded to a page at work and spoke with Kray. Kray told Ting that the police had taken Srip away, and that Ting needed to get Srip and to help Kray interpret and talk with the police. Believing that Kray was confused or mistaken, Ting continued with a project at work. Later, after learning that police were at Srip's residence with Kray, Ting tried to call Kray, but the police had disconnected the telephone. Ting then went to Srip's residence, but the police refused to let him enter. Instead, they directed him to the nearby police "command post."

### D.  STANDOFF BETWEEN KRAY AND TACOMA POLICE

At 9:30 A.M., Kray left Srip's house and walked down the sidewalk with his son, Veasna, and another Asian male. Officer Lowry said, "Police," told the men to put their hands in the air, and began moving toward them. Veasna and the other man cooperated, and police led them away to a police van. But Kray turned and walked back toward Srip's residence.

Lowry again announced his presence, identified himself as a police officer, and commanded Kray to put his hands in the air. Kray turned around, looked at Lowry, gestured for him to go away, continued toward the house, and then ran inside. Initially, Officers White and Lowry ran after Kray. But when Kray entered the house, the officers stopped their pursuit and took cover.

Officer Lowry next spoke with Kray through the front door screen for about 10 minutes. Early in the conversation, Kray stepped onto the porch but then stepped back inside the house. Kray did not leave the house again. Instead, he continued to talk with Lowry through the screen door. Several times during this conversation, Kray became agitated, stepped away from the door, disappeared for a short time, and then reappeared.

Throughout his exchange with Lowry, Kray displayed no weapon. Nonetheless, the police had been advised that he was armed with an AK-47. And Kray grew more agitated as his dialogue with Lowry continued.

Officer Lowry persisted in trying to persuade Kray to cooperate and to come outside, saying that he did not want to arrest Kray, did not want to hurt him, and did not want anybody to get hurt. Lowry repeatedly asked Kray to surrender, urging him to leave the house with his hands showing. Kray did not comply. Instead, he

REPORT AND RECOMMENDATION- 4

demanded that Srip be brought to the front of the house. Lowry told Kray that he could see her only after he surrendered to the police.

E. ESCALATION, CONFRONTATION AND MURDER

At 9:41 A.M., Officers Habib and Nasworthy radioed the command post that they were going to use an ARWEN® to subdue Kray. Used properly, the ARWEN® is a "nonlethal" weapon that propels a large rubber bullet, which incapacitates an individual long enough for police to take him into custody. Nasworthy twice fired the ARWEN® at Kray, striking him between the chest and abdomen.

The entry team then rushed to the front door, expecting to find Kray down and to take him into custody. Lowry entered first, followed by Officers Peck, Standifer, and White. Lowry and White repeatedly said, "Police, get down." RP at 2817. But Kray had disappeared. Kray reached behind a door, grabbed an assault rifle, and reappeared.

The police outside heard gunshots and responded with cover fire, believing that Kray was "strafing" or firing multiple rounds at them with a fully automatic weapon. They continued to fire into the house until Lowry and the remaining members of the entry team were moved to a safe area.

After the shooting, Pierce County SWAT officers replaced the Tacoma SWAT officers. Kray reported to a negotiator that his leg was injured. A teenager who had been hiding in the house reported that Kray had been shot in the left arm or side and was lying on the floor. Kray eventually crawled out of the house, was placed under arrest, and was taken to a hospital.

Officer Lowry had sustained three gunshot wounds, one to the back of his left forearm and another to his right leg, apparently from the same bullet, both nonfatal, and a large, fatal wound to the left side of his chest from a different bullet. The high velocity bullet that entered Lowry's chest first penetrated his bullet-proof vest before injuring his lungs and a rib and "fragment[ing]" his heart. The bullet then exited through the back of Lowry's vest and wounded Officer Peck, who had been standing behind Lowry, prepared to handcuff Kray. It was this powerful shot through Lowry's chest that killed him.

(Dkt. # 15, Exh. 4, pp. 1-7 (all footnotes omitted).

REPORT AND RECOMMENDATION- 5

## II.  CLAIMS FOR RELIEF

In his habeas petition in this Court, Mr. Kray raises the following grounds for relief:

(1)     Petitioner was denied the right to jury trial on the factual elements of the aggravated murder charge and self defense, in violation of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

(2)     Petitioner was denied the right to have notice of the prohibitions of the law and to be free from ex post facto criminal prohibitions with respect to the elements of aggravated murder and the right to self defense, by virtue of the Washington appellate courts' application to his case of a new rule of law that did not exist at the time of the event, in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

(3)     Petitioner was denied the basic right to a trial—a fair trial, with notice of the issues, effective counsel, the opportunity to confront witnesses, present evidence and testify—with respect to the elements of aggravated murder and the right to self defense, in violation of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

(4)     The Washington Court of Appeals based its decision affirming petitioner's appeal on an erroneous and unreasonable determination that the force used by the Tacoma police to arrest Sap Kray was not constitutionally excessive, and thus violated petitioner's rights under the Fourth and Fourteenth Amendments to the Constitution of the United States.

(5)     Petitioner's trial counsel were forbidden to ask the police officer witnesses who testified for the prosecution about meetings they had immediately following the shooting—meetings where they discussed what they thought had happened and several of them changed their stories—in violation of petitioner's right to compulsory process and to confront witnesses guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States.

(6)     Evidence was admitted at petitioner's trial regarding testimonial accusations allegedly made against him by his estranged wife at a time when she was not under oath or subject to cross examination, in violation of petitioner's right to confront witnesses under the Sixth and Fourteenth Amendments to the Constitution of the United States.

(7)     Petitioner was denied the right to effective assistance of counsel, the right to be present, the right to notice, the right to confront witnesses, and the right to due process of law, all guaranteed by the Sixth and Fourteenth Amendments to the Constitution of the United States, when his trial jury was permitted to

> listen to an audiotape that was only partly admitted into evidence without notice to him or his counsel and outside their presence, and the audiotape contained hearsay statements and racist and inflammatory comments about petitioner and persons of his race, and no record was made of the portions the jury was allowed to listen to.

(Dkt. # 1, pp. 3-10).

Respondent concedes that all Petitioner's claims, except his fourth claim (that the Court of Appeals based its decision affirming Petitioner's appeal on an erroneous and unreasonable determination that the force used by the Tacoma police to arrest him was not constitutionally excessive), have been exhausted. (Dkt. # 1, pp. 7-8). After carefully reviewing the petition for writ of habeas corpus (Dkt. # 1), the answer to the petition (Dkt. # 14), the reply (Dkt. # 19, 20), and state court record (Dkt. # 15, # 31), this Court recommends denial of the petition for writ of habeas corpus. Each of the issues raised in the petition are discussed below.

### III.  EVIDENTIARY HEARING[2]

The decision to hold a hearing is committed to the court's discretion. *Williams v. Woodford*, 306 F.3d 665, 688 (9th Cir. 2002). The petitioner bears the burden of showing the need for a hearing. *Pulley v. Harris*, 692 F.2d 1189, 1197 (9th Cir. 1982), rev'd on other grounds, 465 U.S. 37 (1984); *Baja v. Ducharme*, 187 F.3d 1075 (9th.Cir. 1999). A hearing is not required if the claim presents a purely legal question, or if the claim may be resolved by reference to the state court record. *Campbell v. Wood*, 18 F.2d 662, 679 (9th Cir.) (en banc), cert. denied, 114 S. Ct. 2125 (1994).

---

[2]Petitioner filed a separate motion for an evidentiary hearing (Dkt. # 19, # 20). Respondent filed a response (Dkt. #22), Petitioner filed a reply (Dkt. # 23), and Respondent submitted supplemental authority (Dkt. # 26).

REPORT AND RECOMMENDATION- 7

In deciding whether to grant an evidentiary hearing a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which if true, would entitle the applicant to federal habeas relief. *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007) (citations omitted). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *Id*.

Petitioner argues that had he been given proper notice that his right to claim self defense would be limited in the ways that the Washington Court of Appeals later held, he would have presented evidence at trial that the force used against him by police was excessive and unreasonable. (Dkt. # 27 at 3-4). Petitioner also argues that he is entitled to discovery and an evidentiary hearing to learn what occurred during the peer support group meetings protected under RCW 5.60.060(6).

There is no per se entitlement to an evidentiary hearing. Even if Petitioner failed to develop the factual basis for his claims in the state courts or was not granted an evidentiary hearing on his claims, this does not mean that his claims were not adjudicated on the merits, or that the state court's findings should not be accorded deference. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). In addition, where the issue presents purely legal questions, a federal habeas evidentiary hearing is not required. *See*, *Harris v. Pulley*, 885 F.2 1354, 1378 (9th Cir. 1989) (An evidentiary hearing is to present disputed facts.)

As is discussed in more detail herein, the issues presented by Petitioner may be resolved without an evidentiary hearing. Whether the trial court erred in limiting Petitioner's right to claim self-defense and whether it erred in allowing officers to invoke the peer support group privilege, are issues that may be resolved by this Court with reference to the record before it and as a matter of

REPORT AND RECOMMENDATION- 8

1   law.

2       The undersigned concludes that there are no relevant factual disputes to resolve in order to

3   render its decision in this case and accordingly, an evidentiary hearing need not be conducted.

4                                   **IV.  DISCUSSION**

5

6       This Court's review of the merits of Mr. Kray's clams is governed by 28 U.S.C.§ 2254(d)(1)

7   and (d)(2).  Thus, the Court cannot grant a writ of habeas corpus unless a petitioner demonstrates

8   that he is in custody in violation of federal law and that the highest state court decision rejecting his

9   grounds for review was either "contrary to, or involved an unreasonable application of, clearly

10  established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. §

11  2254(c) and (d)(1).  The Supreme Court holdings at the time of the state court decision will provide

12  the "definitive source of clearly established federal law[.] *Van Tran v. Lindsey*, 212 F.3d 1143, 1154

13  (9th Cir. 2000), *overruled in part on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct.

14  1166, 155 L.Ed.2d 144 (2003).  A state-court decision is contrary to clearly established precedent if

15  it "'applies a rule that contradicts the governing law set forth in' " a Supreme Court decision, or

16  "'confronts a set of facts that are materially indistinguishable'" from such a decision and

17  nevertheless arrives at a different result.  *Early v. Packer*, 537 U.S. 3 (2002) (quoting *Williams v.*

18  *Taylor*, 529 U.S. 362, 405-06 (2000)).

19

20      The Supreme Court has also held that "a state court's interpretation of state law, including

21  one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

22  corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).  Therefore, a federal court may not overturn

23  a conviction simply because the state court misinterprets state law.  *See id*. at 605; *Estelle v.*

24  *McGuire*, 502 U.S. 62, 67-68 (1991).

25

26  **A.      Self Defense Instruction - Claims One, Two, Three and Four**

27

28  REPORT AND RECOMMENDATION- 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(1)      Exhaustion - Claim Four**

As an initial matter, the Court addresses Respondent's argument that Petitioner has failed to properly exhaust his fourth claim (that the Washington Court of Appeals erroneously determined that the force police used was not excessive).

A state prisoner must exhaust state remedies with respect to each claim before petitioning for a writ of habeas corpus in federal court. *Granberry v. Greer*, 481 U.S. 129, 134 (1987). Claims for relief that have not been exhausted in state court are not cognizable in a federal habeas corpus petition. *James v. Borg,* 24 F.3d 20, 24 (9th Cir. 1993), *cert. denied*, 115 S. Ct. 333 (1994). The exhaustion doctrine is based upon comity, not jurisdiction. *Rose v. Lundy,* 455 U.S. 509, 518 (1982). Petitioner must prove that a claim has been properly exhausted and is not procedurally barred. *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981). The petitioner must present the claims to the state's highest court, even where such review is discretionary. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Respondent argues that Petitioner's fourth claim is not properly exhausted because Petitioner did not present it in his appellant brief. (Dkt. # 14, p. 28). Respondent acknowledges that Petitioner presented the claim as a federal constitutional claim in his petition for review. (Dkt. # 15, Exh. 7, p. 13-14).

Petitioner replies that there is no barrier to this Court's consideration of this issue as he exhausted his state remedies on this issue not just once but twice. (Dkt. # 20, p. 7). Petitioner did not make this argument in his appellant brief as the constitutional excessiveness of the force used against him was not an issue at his trial or in his direct appeal until the Court of Appeals made it an issue. (Dkt. # 20, p. 6, citing Dkt. # 1, ¶ 12(1)(c)(1)). Petitioner argues that, when the Court of Appeals interjected that issue into the case, his lawyers raised the issue in a petition for rehearing

REPORT AND RECOMMENDATION- 10

and the petition for review.  (Dkt. # 15, Exh. 5, p. 4; Exh. 7, p. 14).

The Court agrees that Petitioner fairly exhausted his remedies with respect to his fourth claim for habeas relief.  As noted in the Washington Court of Appeals' decision, Petitioner contends that his constitutional rights were violated by that appellate court's adoption of a new legal theory regarding the law of self-defense.  (Dkt. # 15, Exh. 11, p. 2-3).

**(2)     The Merits of Claims One, Two, Three and Four**

Petitioner's first four claims for relief relate to the "initial aggressor" instruction that was given at trial along with the self-defense instruction and the Washington Court of Appeal's subsequent affirmance of the trial court's jury instructions.  Petitioner's claims are summarized as follows:

> (1) the self-defense instructions given at trial were fundamentally flawed because the jury should not have been told that self defense was unavailable to an "initial aggressor," when there was no evidence that Mr. Kray engaged in any aggressive behavior toward the officers on the scene and he had withdrawn from the scene of his confrontation with the Auburn police the night before (Dkt. # 20, p. 9);

> (2) the Washington Court of Appeals created new law limiting his right to self defense that was applied for the first time in the unpublished decision in his case, violating his right to be free of ex post facto criminal prohibitions; (Dkt. # 20, p. 13-14);

> (3) Mr. Kray was denied due process notice when the Washington Court of Appeals applied rules limiting self defense that were different from those alleged and applied at his trial because had his lawyers been aware of those rules, they would have handled his case differently (*Id.*, p. 14); and,

> (4) the Washington Court of Appeals based its decision affirming Petitioner's appeal on an erroneous and unreasonable determination that the force used by the Tacoma police to arrest him was not constitutionally defective.  (*Id.*, p. 17).

The giving of a jury instruction which may be incorrect under state law is not a basis for habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Instead, the Court's "review is limited to determining whether an allegedly defective jury instruction 'so infected the entire trial

REPORT AND RECOMMENDATION- 11

that the resulting conviction violates due process.'" *Carriger v. Lewis*, 971 F.2d 329, 334 (9th Cir.

1992) (quoting *Cupp v. Naughten*, 414 U.S. 141 (1973)).  "The burden of demonstrating that an

erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional

validity of a state court's judgment is even greater than the showing required to establish plain error

on direct appeal."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

"A state court decision may not be overturned on habeas review, for example, because of a

conflict with Ninth Circuit-based law, but rather a writ may issue only when the state court decision

is 'contrary to, or involved an unreasonable application of,' an authoritative decision of the

Supreme Court." *Moore v. Calderon*, 108 F.3d 261, 264-65 (9th Cir.), cert. denied, 117 S. Ct. 2497

(1997).  "Where . . . the state court's application of governing federal law is challenged, it must be

shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 124 S. Ct. 1,

4 (2003).

"Outside of the capital context, we have never said that the possibility of a jury misapplying

state law gives rise to federal constitutional error.  To the contrary, we have held that instructions

that contain errors of state law may not form the basis for federal habeas relief." *Gilmore v. Taylor*,

508 U.S. 333, 341 (1993)(citing *Estelle v. McGuire*, supra). Although the Constitution guarantees

defendants a meaningful opportunity to present a complete defense, the cases invoking this

principle dealt with the exclusion of evidence. *Gilmore*, 508 U.S. at 343. A claim that a defendant

was entitled to an instruction concerning self-defense fails to state cognizable claims for relief. *Id*.

> [T]he fact that the instruction was allegedly incorrect under state law is not a basis
> for habeas relief. . . It must be established not merely that the instruction is
> undesirable, erroneous, or even universally condemned, but that it violated some
> [constitutional right] . . . .

*Estelle*, 502 at 71-72 (internal quotation marks omitted) (citations omitted).

*See also, Mitchell v. Goldsmith*, 878 F.2d 318 (9th Cir. 1989) ("In the absence of a federal

REPORT AND RECOMMENDATION- 12

constitutional violation, no relief can be granted even if the instruction given might not have been correct as a matter of state law.")  The petitioner must prove the failure to properly instruct the jury violated some right guaranteed defendants by the Fourteenth Amendment. *Cupp*, 414 at 146.

### (a)    Flawed Self-Defense and Aggressor Instructions and Lack of Trial Notice - Claims One and Three

Mr. Kray argues that the Washington appellate courts ignored his argument that the "initial aggressor" instruction should never have been given because there was no evidence that he was engaged in aggressive behavior toward the officers at the scene of the shooting and he had withdrawn from confrontation with the Auburn police the night before.  (Dkt. # 20, p. 9). Additionally, Mr. Kray argues that the Washington Appellate courts erred when they held that it did not matter if the instructions were fundamentally flawed because the trial court could have refused to give any self defense instructions because the force used against him was not excessive and he created the need for the force.  (*Id*. at 20-21).  These holdings, Mr. Kray maintains, violate his Sixth Amendment right to a fair jury trial on all elements of the charge against him and violate the related, but distinct principle of due process notice.

The Washington Court of Appeals addressed these arguments in Mr. Kray's personal restraint petition as follows:

> Kray went to trial on charges that he killed a police officer who was attempting to arrest him after he assaulted his estranged wife with a rifle.  At the end of his trial, the trial court gave the jury both self-defense and aggressor instructions. The primary self-defense instruction provided as follows:
>
> It is a defense to a charge of murder that the homicide was justifiable as defined in this instruction.
> Homicide is justifiable when committed in the lawful defense of the slayer when:
> (1) the slayer reasonably believed that the person slain intended to inflict death or great personal injury;
>
> (2) the slayer reasonably believed that there was imminent danger of such

REPORT AND RECOMMENDATION- 13

harm being accomplished; and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him, at the time and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable.  If you find the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

Instruction 25.  The trial court further instructed the jury that "[a]ctual danger is not necessary for a homicide to be justifiable."  Instruction 29.  The aggressor instruction then provided:

No person may, by any intentional act reasonably likely to provoke a belligerent response, create a necessity for acting in self defense and thereupon kill, use, offer or attempt to use force upon or toward another person.  Therefore, if you find beyond a reasonable doubt that the defendant was the aggressor, and that defendant's acts and conduct provoked or commenced the conflict, then self-defense is not available as a defense.

Instruction 30A.  The jury rejected Kray's self-defense theory and convicted him of murder as well as assault.

On appeal, one of Kray's arguments was that the trial court erred by giving an aggressor instruction along with the self-defense instructions.  This court held that because Kray had no right to act in self-defense, he was not entitled to self-defense instructions, and any error regarding the effect of the aggressor instruction on his self-defense claim was harmless beyond a reasonable doubt.  No. 24680-5-II (December 6, 2002).  Our unpublished opinion explained that a person may resist a police officer's use of excessive force to effect an arrest if the arrestee is actually about to be seriously injured.  Kray was not entitled to resist because the police used force that, while deadly, was lawful and not excessive under the circumstances, and because he created the need for the police to use deadly force.

In this personal restraint petition, Kray argues that his constitutional rights were violated by this court's adoption of a new legal theory regarding the law of self-defense; i.e., that a person must show that a police officer's use of force in effecting an arrest was excessive to be entitled to assert that he resisted in self-defense.  Kray maintains that he never had the opportunity to demonstrate that the officer's use was excessive and that this court usurped the jury's role in determining that it was not.

To be entitled to relief, a petitioner claiming constitutional error must show that such error caused actual and substantial prejudice to his case. *In re Cook*, 114 Wn.2d 802, 810-13 (1990). Kray fails to make this necessary showing. Instead of

REPORT AND RECOMMENDATION- 14

being required to meet a higher standard of self-defense with evidence that he was in actual danger of serious injury as the result of the officer's use of excessive force, Kray received the benefit of self-defense instructions requiring the jury to find only that he reasonably believed that (1) the officer intended to inflict great personal injury and (2) there was imminent danger of such harm. Had the trial court followed the law of self-defense as set forth in this court's opinion, Kray would have had to submit additional evidence to justify more restrictive self-defense instructions. Instead, Kray obtained more lenient self-defense instructions to which he was not entitled. Kray cannot show that this court's analysis regarding the law of self-defense caused him actual prejudice.

(Dkt. # 15, Exh. 11, pp. 2-3).

In this case, the Court agrees that any error was harmless for the reasons succinctly described in the state court's decision. (*See* Dkt. # 15, Exh. 11, pp. 2-3). As noted by the Washington Court of Appeals, Mr. Kray went to trial on charges that he killed a police officer who was attempting to arrest him after he assaulted his estranged wife with a rifle. Had the trial court followed the law of self-defense as set forth in the Washington appellate court's opinion, Mr. Kray would have had to submit additional evidence to justify more restrictive self-defense instructions at trial. Although Mr. Kray maintains that there was insufficient evidence at trial to support an "initial aggressor instruction," a state court's failure to instruct or error in instructing a jury regarding self-defense provides no basis for federal habeas relief. See *Gilmore*, 508 U.S. at 343.

Neither does this Court find the Washington Court of Appeals' treatment of this issue contrary to the due process principles stated in *Presnell v. Georgia*, 439 U.S. 14 (1978) and *Cole v. Arkansas*, 333 U.S. 196, 202 (1948) ("[t]o conform to due process of law, [criminal defendants are] ... entitled to have the validity of their convictions appraised on consideration of the case as it was tried and as the issues were determined in the trial court.") As noted by Mr. Kray, those cases stand for the proposition that a criminal defendant is entitled to have his conviction appraised on the same facts and same issues as were determined in the trial court. In the Washington Court of Appeals' analysis of whether the trial court had erred in the first instance in giving the "initial aggressor"

REPORT AND RECOMMENDATION- 15

instruction with the self-defense instruction, the appellate court noted that the trial court did not err

because it *could* have imposed the higher standard of self-defense based on the evidence before it.

(Dkt. # 11, p. 3).  Instead, the trial court gave self-defense instructions which required the jury to

find only that he reasonably believed that (1) the officer intended to inflict great personal injury and

(2) there was imminent danger of such harm. (*Id*.).  Thus, the Washington Appellate Court's

analysis of what the trial court *could* have done could not have caused Mr. Kray actual prejudice.

### (b)     Ex Post Facto Violation and Excessive Force - Claims Two and Four

Mr. Kray also contends that the Washington Court of Appeals created new law limiting his

right to self defense that was applied for the first time in the unpublished decision in his case.  (Dkt.

# 20, p. 13-14).  Mr. Kray argues that this changing or creation of new law after the fact violates

due process and is an ex post facto violation not subject to harmless error analysis.  (*Id*.).

Related to Mr. Kray's ex post facto claim, is his claim that he was denied the right to

demonstrate that the force used against him at the time of his arrest was excessive, contrary to the

holding of the Washington Court of Appeals.  (Dkt. # 1, p. 8).  Mr. Kray argues that the law at the

time of his trial did not preclude a claim of self-defense against the use of police force solely

because the police used force that "while deadly, was lawful and not excessive under the

circumstances" or the person created the need for the police use of deadly force.  *(See, e.g.*, Dkt. 10,

p. 6).  Mr. Kray contends that had he been given notice that his right to use self defense would be

limited in the ways that the Court of Appeals *would later hold*, his defense would have been

handled differently in many respects.  (Dkt. # 20, p. 15).  Mr. Kray states that he would have called

additional witnesses, including a police practices expert to testify that the use of the ARWEN

against him by the police was excessive and unreasonable under the circumstances; his counsel

would likely have asked different questions and would have briefed and argued different legal

REPORT AND RECOMMENDATION- 16

motions; and, he argues it is reasonably probable he would have made a different decision about the offer of second degree murder on a guilty plea.  (*Id.*).

A fundamental principle underlying due process is that a criminal statute must give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden, that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harris*, 347 U.S. 612, 617 (1954)). To violate due process under *Bouie*, the construction given "the statute by the state court must have been a radical and unforeseen departure from prior law." *Hayes v. Woodford*, 301 F.3d 1054, 1088 (9th Cir. 2002)(citing to *United States v. Walsh*, 770 F.2d 1490, 1492 (9th Cir. 1985)).

The touchstone of due process is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).  If a state legislature is barred by the Ex Post Facto Clause from passing such a law [that retroactively enlarges a criminal statute], it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."). *Bouie*, 378 U.S. at 353-54.

The Washington Court of Appeals decision at issue is as follows:

### A.  INITIAL AGGRESSOR INSTRUCTION

The defense theory at trial was that Kray shot Officer Lowry in self-defense. As Kray requested, the trial court instructed the jury on self-defense.  Kray argues that the trial court erred by giving a corresponding instruction that if Kray was the initial aggressor, self-defense was not available as a defense.  Clerk's Papers (CP) at 190 (Instruction No. 30A).

An error affecting a defendant's claim of self-defense is constitutional in nature and mandates reversal unless the error is harmless beyond a reasonable doubt. *State v. Birnel*, 89 Wn. App. 459, 473, 949 P.2d 433 (1998), *review denied*, 138 Wn.2d 1008 (1999).  Any errors pertaining to the self-defense instructions here were

REPORT AND RECOMMENDATION- 17

harmless because under the circumstances of this case, Kray was not entitled to a self-defense instruction. Kray's own actions necessitated the Tacoma Police SWAT team's attempted entry of Srips's home, both to arrest him for assaulting Srip and to remove him from her home; and it was this lawful, attempted entry by the police that Kray argues justified his use of deadly force in "self-defense."

We have previously held that, under the "arrest rule," a person may resist a police officer's use of *excessive* force to effect an arrest if the arrestee is actually about to be seriously injured. *State v. Westlund*, 13 Wn. App. 460, 466, 536 P.2d 20, *review denied*, 85 Wn.2d 1014 (1975). Here, even assuming for purposes of this discussion that the police were preparing to shoot at Kray, Kray was not entitled to resist because (1) the police used force that, while deadly, was lawful and not excessive under the circumstances, and (2) Kray created the need for the police to use deadly force.

### 1. NO RIGHT TO RESIST LAWFUL FORCE

In Washington, police officers have statutory authority to use deadly force to effect an arrest. Under RCW 10.31.050, an officer may use all necessary means to effect an arrest if the suspect flees or forcibly resists arrest. RCW 10.31.050; *se also* RCW 9A.16.020(1).[10] An officer making a lawful arrest may use any force reasonably necessary to "secure and detain the offender, overcome his resistance, prevent his escape, and secure him if he escapes." *Smith v. Drew*, 175 Wash. 11, 18, 26 P.2d 1040 (1933).

We judge the "reasonableness" of a particular use of force from the perspective of a reasonable officer on the scene, not "20/20 hindsight." *Staats v. Brown*, 139 Wn.2d 757, 774, 991 P.2d 615 (2000). It is a "standard of the moment" because "police officers are often forced to make split-second judgments in tense, uncertain, and rapidly evolving circumstances." *Staats*, 139 Wn.2d at 774.

When "necessary," police officers may use deadly force. RCW 9A.16.040 provides for the use of deadly force by a peace officer when necessary "to overcome actual resistance to the execution of the legal process, mandate, or order of a court or officer, or in the discharge of a legal duty" or "[t]o arrest or apprehend a person who the officer reasonably believes has committed, has attempted to commit, is committing, or is attempting to commit a felony[.]" RCW 9A.16.040(1)(b), (c)(1). Deadly force is necessary only if the officer has probable cause to believe that the suspect "poses a threat of serious physical harm to the officer or a threat of serious physical harm to others." RCW 9A.16.040(2). Such a threat may exist if the suspect threatens the officer with a weapon or if the officer has probable cause to believe that the suspect has committed any crime involving the infliction or threatened infliction of serious physical harm. RCW 9A.16.040(2)(a) and (b). Such was the case here.

The Tacoma Police investigated Kray's domestic violence rifle-assault against his estranged wife and planned to arrest him. Kray had (1) threatened Srip

with a rifle outside her home, (2) followed her to her place of work, (3) left and returned again, at which point he displayed an apparently loaded rifle to police, (4) drove to Srip's home and entered it, (5) refused to cooperate with the police's request to surrender outside Srip's house, (6) reentered her house, and (7) refused to leave after repeated, patient, nonconfrontational requests by Officer Lowry. Meanwhile, Kray had become more agitated.

The police had information that Kray had a powerful assault rifle inside Srip's house. Their attempts to negotiate with Kray and to subdue him using nonlethal force, the ARWEN®, had failed. When the entry team rushed the front door, they expected to find him subdued and to handcuff him. But this was not the case. Before anyone fired, Officer Lowry twice shouted, "[P]olice, get down." RP at 2817. Then essentially simultaneous shots were exchanged between Officer Lowry and Kray, who had an assault rifle. Officer White testified that within a "split second" of seeing a "puff of smoke come out of the barrel of [Lowry's] weapon," he "heard a large big loud boom coming from inside," presumably Lowry's assault rifle. RP at 2818. Under these circumstances, where officer and suspect are facing each other with firearms, the officer is not required to wait for the suspect to fire first, further imperiling the officer. Accordingly, we conclude that the SWAT team did not use excessive force by shooting at Kray, regardless of who fired first.

Cases decided since *Smith* and *Westlund* have neither reiterated nor eliminated the long-standing "excessive force" requirement. The Supreme Court, for example, has held simply that a person has a right to use "reasonable and proportional force to resist an attempt to inflict injury on him during the course of an arrest[.]" *State v. Valentine*, 132 Wn.2d 1, 21, 935 P.2d 1294 (1997). More recently, the Court ruled: "A person may claim self-defense and use force to resist only when that person is in actual, imminent danger of serious injury." *State v. Bradley*, 141 Wn.2d 731, 733, 10 P.3d 358 (2000).

*Valentine* and *Bradley's* omission neither negates the excessive force requirement[11] nor controls the issue before us. The facts and the defendants' arguments in those cases are distinguishable; and they led the Court to focus on the "actual danger" requirement, rather than on whether the degree of force the officers used was "excessive." First, both Valentine[12] and Bradley[13] were already or almost in custody when they resisted the officers' forceful actions. Valentine had been stopped for a traffic offense; Bradley was already in jail. In contrast, Kray had not yet been taken into custody; rather, he refused to surrender and remained inside his estranged wife's house, armed with an assault rifle. RP at 2077; 1875; 1883.

Second, neither the law enforcement officers nor the defendants in *Valentine* and *Bradley* employed deadly force, as was the case here. Here, police employed deadly force only after exhausting sequential, nondeadly, though increasingly forceful, means to arrest Kray. Kray precipitated the stand-off with the police. Earlier, Kray had implied that he was looking for a shoot-out with the police.[14] Later, he refused all police entreaties for police surrender. Moreover, he had a

REPORT AND RECOMMENDATION- 19

powerful assault rifle inside Srip's house, and some teenagers remained inside with him.  Finally, not even the nonlethal ARWEN had successfully subdued Kray long enough for the police to handcuff him.  Instead, he reached back into the doorway and produced the assault rifle.  RP at 4531.  Because of these pivotal factual differences.  *Valentine* and *Bradley* have little bearing on the facts of the case here.

Washington courts have not departed from the rule in *Westlund*, 13 Wn. App. at 466, that a person may not use force to resist arrest unless he faces actual danger of serious injury or death *and* the force used by the police is excessive.  Here, the police's use of deadly force against Kray was lawful and not excessive, and Kray had no right to resist the arrest by any means.

_____

[[10]Use of force is lawful" [w]henever necessarily used by police officer in the performance of a legal duty." RCW 9A.16.020(1).

[11] Although the Supreme Court did not discuss the excessive force requirement in either *Valentine* or *Bradley*, in both cases the Court acknowledged the requirement by quoting *Westlund* for the rationale supporting the actual danger standard:

> [T]he arrestee's right to freedom from arrest without excessive force that falls short of causing serious injury or death can be protected and vindicated through legal processes, where as loss of life or serous physical injury cannot be repaired in the courtroom.

*Bradley*, 141 Wn.2d at 737; *Valentine*, 132 Wn.2d at 20; *see also State v. Holeman*, 103 Wn.2d 426, 430, 693 P.2d 89 (1985) (each quoting *Westlund*, 13 Wn. App. At 467) (no right to resist perceived unlawful arrest of a third party absent threat of serious bodily injury).

[12] [Internal citations relating to facts of *Valentine* case omitted.]

[13] [Internal citations relating to facts of *Bradley* case omitted.]

[14]At Emerald Downs, he had displayed and brandished his rifle at the police, asked rhetorically if they wanted to kill him, and told them that his life was not worth anything and he did not care if he died that night.  RP at 505.  Kray also displayed the gun to Phoung and said "I can shoot you any time I want to shoot," after which Phoung ran into the Emerald Downs office.  RP at 4016-4018.  Arguably, then, as Kray's agitation escalated, the potential for endangering the teenagers inside Srip's house correspondingly increased.

(Dkt. # 15, Exh. 4, p. 11-18).

REPORT AND RECOMMENDATION- 20

Not finding Washington cases with facts similar to that in Mr. Kray's case, the Washington Court of Appeals turned to other jurisdictions that had addressed the use of deadly force in self-defense against law enforcement officers and rejected self-defense claims when the defendant created the need for the officers to use deadly force.  *Id*., p. 16.  For guidance, the Court of Appeals turned to cases from Alaska (*Gray v. State*, 463 P.2d 897 (1970) and the Fifth Circuit (*United States v. Branch*, 91 F.3d 699 (5th Cir. 1996)). (*Id*., pp. 16-17).[3]  The appellate court continued:

> Here, as in *Gray* and *Branch,* the police used deadly force only because of Kray's precipitating actions.  As discussed above, Kray had threatened his estranged wife with an assault rifle and, despite the clear intention of the officers to arrest him, Kray continuously refused to leave Srip's house.  When the attempts to negotiate with Kray and to subdue him using the ARWEN® failed, Kray suddenly appeared with his assault rifle.  At this point, the police had ample justification to use deadly force to protect themselves and the teenagers inside, and to effect Kray's arrest. Such use of force by law enforcement was not excessive here.
>
> Because under these circumstances, Kray had no right to act in self-defense, he was not entitled to any self-defense instructions at trial.  Thus, the effect of the initial aggressor instruction on Kray's self-defense claim, if error, was harmless beyond a reasonable doubt.

(Dkt. # 15, Exh. 4, p. 18).

Mr. Kray argues that this type of *ex post facto* treatment is not a "trial type" error, but is a

---

[3]In *Gray*, where a police officer was killed in an exchange of gunfire, the trial court's refusal to instruct the jury on self-defense was upheld on appeal because a "person who provokes a difficulty thereby forfeits his right to self-defense."  *Gray*, 463 P.2d at 908. (*Id*.).  In its holding, the *Gray* Court looked to the Washington Supreme Court case of *State v. Wilson*, 26 Wn.2d 468, 174 P.2d 553 (1946) to support its holding.  There, the Washington Supreme Court stated that "[i]t is settled law that one who was the aggressor or who provoked the altercation in which he killed the other person engaged in the conflict, cannot successfully invoke the right of self-defense to justify or excuse the homicide, . . .. " (*Id*. at 17 n. 15).

In *Branch*, the Fifth Circuit held that the Davidians could not claim self-defense because "[i]t is a necessary precondition to the claim of self-defense that the defendants be free from fault in prompting the . . . use of force."  *Branch*, 91 F.3d at 717.  In *Branch*, the Davidians had amassed weapons inside a fortified compound and fired upon Alcohol, Tobacco and Firearms agents who were attempting to execute a search and arrest warrant.  *Id*. at 710.

REPORT AND RECOMMENDATION- 21

structural error, not subject to harmless error analysis.  Under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 632 n. 7, 638 (1993), a trial-type constitutional error is harmless unless it has a "substantial and injurious effect or influence in determining the jury's verdict."  This is the appropriate analysis, contrary to Mr. Kray's argument, for a jury instruction error resulting from application of an *ex post facto* statute.  *See Murtishaw v. Woodford*, 255 F.3d 926, 973 (9th Cir. 2001) (identifying jury instruction error as a "trial-type error that occurred during the presentation of the case to the jury").

Mr. Kray would have the Court categorize an appellate court's review of a trial court's jury instruction as the type of "structural" error affecting the structure of a trial mandating automatic reversal.  The Supreme Court has identified only a narrow category of constitutional errors that is not subject to harmless error analysis.  *See Neder v. United States*, 527 U.S. 1, 8 (1999)(noting that structural errors requiring automatic reversal include: complete denial of counsel; biased trial judge; racial discrimination in selection of grand jury; denial of self-representation at trial; defective reasonable doubt instruction).  The Court is not aware of any cases that hold differently where a petitioner argues that the constitutional error was caused first by an erroneous jury instruction at trial and then affirmed by an improper *ex post facto* theory on appeal.

Under the standard set forth in *Brecht*, this Court cannot say that the effect of the state appellate court's "reinterpretation" of the initial aggressor instruction on Mr. Kray's self-defense claim had a "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 632 n. 7, 638.  We begin first with the general principle that a state appellate court's reinterpretation of a criminal statute may be so novel as to be 'unforeseeable' and therefore deprive a defendant of fair notice of the possible criminality of his act at the time it is committed.  See *Bouie*, 378 U.S 347.  Thus, the retroactive application of the new interpretation itself can be said to

REPORT AND RECOMMENDATION- 22

1   be the denial of due process.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 n. 10 (1975).  However, the

2   Supreme Court has repeatedly held that state courts are the ultimate expositors of state law and that

3   federal courts are bound by their constructions except in extreme circumstances.  *Id*.

4
5       In this case, Mr. Kray was not denied the right to put on a defense of self-defense at trial nor

6   was he denied the right to a self-defense instruction.  *Id*. at n.11.  As noted by the Washington Court

7   of Appeals, Mr. Kray was not prejudiced by its opinion; had the trial court followed the law of self-

8   defense as set forth by the Washington Court of Appeals, Mr. Kray would have had to submit

9   additional evidence to justify more restrictive self-defense instructions. (Dkt. # 15, Exh. 11, p.3).

10  As it was, Mr. Kray obtained more lenient self-defense instructions, to which the appellate court

11  believed he was not entitled.  (*Id*.)

12
13      Accordingly, the Court cannot say that the Washington Court of Appeal's interpretation of

14  Mr. Kray's case and the state law was an "obvious subterfuge to evade consideration of a federal

15  issue," such that it deprived Mr. Kray of notice and a fair trial.  *Id*.

16      Mr. Kray fails to establish that the use of the self-defense instruction by the trial court had a

17  substantial and injurious effect on the verdict.  Instead, any error was harmless for the reasons

18  described in the state courts' decisions.  (*See* Dkt. 15, Exh. 4, pp. 11-18; Exh. 11, pp. 2-3).  In

19  addition, Mr. Kray fails to establish that, when the Court of Appeals later affirmed the trial court's

20  decision to use the more lenient self-defense instructions, that such affirmance violated his right to

21  have his conviction appraised on consideration of the case as it was tried and as the issues were

22
23  determined in the trial court.

24      As such, Mr. Kray fails to establish a basis for habeas relief relating to the self-defense

25  instructions.  The Washington appellate courts' adjudication of the claim on the merits is not

26  contrary to, or an unreasonable application of, clearly established federal law.  To this Court's

27

28  REPORT AND RECOMMENDATION- 23

knowledge there is no United States Supreme Court's opinion that would hold under the circumstances of this case, that the trial court's decision to give the aggressor instruction along with the self-defense instruction violated Petitioner's constitutional rights.

**B.     Claim Five - Denial of Confrontation - Cross-Examination of Police Officers/Exclusion of Post-Incident Briefings**

Mr. Kray states that his trial counsel were forbidden to ask police officer witnesses who testified for the prosecution about meetings they had immediately following the shooting, where it was apparent that the incident was reviewed at the meetings and several of them changed their reported version of the events.  (Dkt. # 1, p. 8; Dkt. # 20, p. 19).   Mr. Kray claims that restrictions placed on his counsels' ability to question these officers about the content of the meetings and the fact that the meetings occurred, violated his right to compulsory process and to confront witnesses guaranteed by the Sixth and Fourteenth Amendments.  (*Id*.).

Respondent counters that state courts' evidentiary rulings are not proper subjects for federal habeas corpus review absent a showing of a due process violation. Here, Respondent argues, the trial court properly excluded the records because the records were privileged under state law. (Dkt. # 14, p. 47).  In addition, Mr. Kray's counsel was able to reveal inconsistencies in officers' testimonies through skillful cross-examinations.  (*Id*.).

The Washington Court of Appeals addressed Mr. Kray's argument, concluding, beyond a reasonable doubt, that the trial court's exclusion of testimony about the CISD sessions did not affect the verdict in spite of its exclusion:

A. POST-INCIDENT DEBRIEFINGS

Shortly after the shooting, the officers participated in a "tactical" debriefing meeting. Forensic information, such as how many shots Kray had fired, was not discussed at this first debriefing. The officers gave taped statements later that afternoon. At this point, the officers generally believed that Kray had fired multiple shots.

REPORT AND RECOMMENDATION- 24

Later, the officers who had witnessed the shooting participated in Critical Incident Stress Debriefing (CISD) meetings, which the police department holds when officers are involved in shootings and other critical incidents. The first CISD meeting was held on August 28 or 29, 1997.[3] At this meeting, police learned that (1) a forensic investigation revealed that Kray had fired only one bullet, which had caused the fatal wound to Officer Lowry;[4] and (2) SWAT team members had caused Officer Lowry's other nonfatal wounds when they responded with cover fire.

After learning that Kray had fired only one bullet, the officers then believed, and later testified, that they had heard one loud "boom" from Kray's rifle, followed by several quieter shots from police weapons. For instance, Officer Wolph testified that he first heard a loud shot from a high caliber weapon, after which he heard other shots that were not quite as loud. Approximately one week after giving their initial statements, the officers submitted corrected statements.

. . .

C.  DISPUTED EVIDENTIARY RULINGS

Over objections by defense counsel, the trial court (1) excluded, as privileged, statements that police officers had made at CISD sessions.

. . .

D. CISD PRIVILEGE

At trial, Kray sought to question the officers at the scene about their first group Critical Incident Stress Debriefing (CISD)[5] meeting after the shooting. All of the officers who testified at trial asserted a peer group support privilege under RCW 5.60.060(6).[6]

The trial court ruled in limine that communications by participants in the CISD meetings were privileged under the statute and, therefore, Kray could not cross-examine the officers about what was said. The court also prohibited reference to the fact that a CISD meeting had occurred, ruling that the prejudicial effect of mentioning the CISD meeting outweighed its probative value. Later, the trial court denied Kray's motion to reconsider.

After some of the officers had testified, the court examined Officer G. J. Roberts in camera.[7] The trial court determined that Officer Roberts' perceptions of the incident had not changed as a result of the CISD sessions, and it again excluded testimony about the CISD sessions as privileged under RCW 5.60.060(6).

Kray challenges the trial court's exclusion of all testimony about the CISD sessions.  The State counters that error, if any, was harmless.[8]  We agree.  We need not address the scope of the CISD privilege or whether the trial court erred in

REPORT AND RECOMMENDATION- 25

excluding any reference to the CISD sessions.

The alleged error is of constitutional magnitude because it implicates Kray's right to confront and to cross-examine adverse witnesses under the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington State Constitution. *See State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002). Again, constitutional error is harmless where (1) there was overwhelming untainted evidence of the defendant's guilt, and (2) where we are convinced beyond a reasonable doubt that the error did not affect the jury's verdict. *Easter*, 130 Wn.2d at 242.

We are convinced beyond a reasonable doubt that the trial court's exclusion of testimony about the CISD sessions did not affect the verdict because in spite of this exclusion, Kray was able to bring out the inconsistencies in the officers' statements that he sought to reveal through the requested CISD testimony. Any information Kray might have elicited about the CISD meetings, though relevant, would have been cumulative. Under ER 403, a trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Consistent with this appraisal, Kray acknowledges that cross-examination revealed inconsistencies in the officers' statements. But he contends that the cross-examination was not as effective as it might have been had he been able to reveal the reason for the inconsistencies. (The jury never had the opportunity to consider that these witnesses had occasion to harmonize --consciously or unconsciously -- their testimony to implicate Kray. Brief of Appellant at 153.)

The State counters that the information presented at the CISD that changed the officers' views about what happened was available from other sources.[9] The record supports the State's position. For example, Officer Roberts, who had been at the scene as a sniper stationed across the street from Srip's house, testified on voir dire that the forensic evidence presented at the CISD sessions changed his perception of the shooting. And Sergeant Habib testified on cross-examination that his perception changed when he learned that Kray had fired only one bullet.

Kray also argues that the CISD was relevant to show each officer's state of mind at the time of the shootings and that referring to the CISD was necessary because the officers gave official statements only after the first CISD.[10] He is incorrect. Several officers gave their initial statements after the August 28, 1997 meeting immediately following the incident, but this meeting was not a CISD session.[11] The officers did prepare supplemental or corrected reports after the first CISD. But again, defense counsel was able to bring out the inconsistencies between these reports and the officers' original statements.

The State relied heavily on several officers' testimony about hearing a

REPORT AND RECOMMENDATION- 26

sequence of the "boom" of a high caliber assault rifle, inferentially Kray's, followed by the "pop, pop, pop" of the SWAT team weapons. The State advanced this evidence to support its theory that Kray was armed and ready to shoot first when the police officers entered the house.

But even without substantive details of what was discussed at the CISD debriefing, Kray was able to show the unreliability of the officers' memories of the shooting and to discredit the State's theory that Kray shot first. Officer White, for example, testified that it was Officer Lowry who fired first. And Kray's counsel ably cross-examined Officer Wolph, a SWAT team sniper stationed across the street from the house with Officer Roberts. Wolph testified on direct that he heard a very loud first shot from a large caliber gun, followed by subsequent shots that were not as loud. He also testified that he saw the large picture window of the house shatter and splinters fly. On cross-examination, Kray impeached Wolph with his prior inconsistent statements:

Q: You were asked by [Detective] Judge, "Okay, the first round you heard fired, would that be something you could recognize as being one of your weapons?" And, you answered, "I don't know, I don't know." Is that correct?
A: That's what it states here, yes.
Q: And, that was your recollection on [August 28, 1997].
A: That's what it states here.
[objection omitted]
. . .
Q: Is that still your recollection, officer?
A: No, it's not accurate.
. . .
Q: [Reading from August 28, 1997 taped statement transcript] You were asked, "Could you tell if there were any shots being fired from within?" Were you not?
A: ... Yes.
Q: And, you replied, "Oh, yeah, we could see the difference--because--the--the--I was looking through a pair of binoculars." Is that what you responded?
A: That's correct.
. . .
Q : You believe there were shots being fired from within the house out?
A: At that point in time I did, yes, I did.
. . .
Q: So, on August 12th of 1998, it was still your opinion that the shooting had come from ... inside the house, is that correct?
A: Actually, I learned otherwise.

RP at 1922-24, 1927.

Sergeant Still, a SWAT team sniper stationed behind the house on August 28, also testified that he heard a very loud first shot from a large caliber gun, followed by smaller caliber shots. *See* RP at 1975-76 ("I'm [m]ore than 50 percent [certain], if

REPORT AND RECOMMENDATION- 27

I have to give it a percentage, it was the larger caliber round first."). Defense counsel highlighted Still's failure to distinguish the caliber of the guns in his initial statement:

Q: Is there anyplace in your report, that tape recorded statement, that distinguishes the caliber of guns?
A: No

RP at 1986.

Similarly, Officer Kelstrup, who was on the SWAT ground team stationed behind a tree near Srip's house, testified that he heard "[o]ne loud bang and then four to five other sounds of a weapon being discharged that weren't as loud as the first one." RP at 2573. Like the other officers, Kelstrup did not mention the difference between the shots in his initial statements. Kray cross-examined Kelstrup as follows:

Q: [reading from report] "The next thing I hear is full automatic fire from what sounds like an AK-47 [large caliber fire]."
Is that what you told Officer Pollard that day?
A: That was my perception at that time, yes.
Q: And that's what you told him?
A: Yes.
Q: Was that an accurate perception at the -- you weren't trying to deceive Officer Pollard?
A: No.
. . .
Q: You say right after that, "Uh, just, uh, high cyclic rate of automatic weapon." You said that, did you not?
A: That's correct, at the time.
. ..
Q: ... [Y]ou say, "I could still hear, uh-huh, 7.62 [large caliber or AK-47] rounds being fired. They have a distinct sound."
. . . You said that. Is that not correct?
A: That's correct.
Q: You heard, you told Officer Pollard that you heard more than one 7.62 round; isn't that correct?
A: That was my perception at the time, yes.
. . .
Q: How many different rounds did you perceive being fired by this 7.62, its distinctive sound?
. . .
A: My perception at the time was it would be probably several times.
. . .
Q: So your perception on August 28th of '97 is that there are shots coming out, cyclical fire from the 7.62, and your perception 11 months later is that you can't recall the order of the shots, and your testimony today is that you can recall the order

of the shots; is that correct?
A: Yes, it is.

RP at 2621-22, 2627-28, 2634.

Finally, like the others, Sergeant Habib did not mention the difference in sound between the shots in his initial report. Yet he, too, testified on direct that he heard "one loud boom, and then a pop, and then a pop, pop, pop." RP at 4494-95. On cross-examination, Kray again highlighted the witness' failure to distinguish between the shots in his taped statement:

Q: Now, ... you indicated that he opened the screen and then the rest of the guys followed him and it was just seconds after that that the suspect started firing full automatic, an AK-47; is that correct?
A: Yes.
. . .
Q: It sounded like an AK-47, didn't it?
A: Yes.
Q: And it sounded like it was on full automatic fire; isn't that right?
A: Yes.
Q: And you can distinguish the other weapons from the AK-47, right?
A: The loudness of the weapon, yes. It was different.
. . .
Q: You did write a report that was dated [September 4, 1997]; is that not correct?
A: A supplemental report, yes.
Q: And it was to correct information from your taped statement?
A: Yes.
. . .
Q: Were you suffering any of the effects of the stress on September the 4th?
A: I was still dealing with it.
. . .
Q: You didn't mention anything about correcting your perception that it was fully automatic AK-47 fire, did you?
A: No, I didn't.
Q: You didn't mention anything about a boom, pop, pop, pop, did you?
A: Not in the supplement. ... I didn't write any other reports whatever.
. . .
Q: So you were pretty convinced about what happened was what happened until such time as you started talking to other people and they started telling you that your perceptions couldn't be right?
A: No.
Q: No?
A: No.
Q: Could you explain, please?
A: We were made aware that one round had been fired.
Q: That changed your mind about what happened?

REPORT AND RECOMMENDATION- 29

A: That, along with having gone out and did the walk-through, being asked by the detectives to have each of the officers place themselves in position, we were able to see what the sequence of that had been, and why we had the perception that we had.

A: So what you're testifying to is not your perceptions of what happened, but what you've learned at the walk-through and talking to other officers? [objection omitted]

. . . .

THE WITNESS: Again, my initial report was based on the perception of what had occurred out there, what we believed had occurred. And then after doing the walk-through and being given more information, we realized that the sequence of events that transpired in front of us, we were somewhat off in what we--what had actually occurred.

RP at 4526, 4534, 4435-36, 4545-47.

These excerpts show that Kray was able to cross-examine the officers sufficiently without mentioning the CISD sessions. Furthermore, the inconsistencies in the officers' statements about the number of shots Kray fired were largely irrelevant because the jury heard uncontroverted forensic evidence that Kray fired only one bullet from the assault rifle (the shot that killed Lowry), not multiple shots as the officers had initially believed. And they also heard testimony that Officer Lowry shot first. But, as we concluded above, who shot first was irrelevant here because the exchange of fire was virtually simultaneous and Kray was not entitled to use self-defense against lawful police actions, which were not excessive under the circumstances. Thus, the value of questioning the officers at trial about the CISD was marginal and did not materially affect the verdict.

Finally, any error in excluding testimony about the CISD sessions was harmless in light of the overwhelming, untainted evidence of Kray's guilt. *See Easter,* 130 Wn.2d at 242. As discussed in the previous section, because self-defense was unavailable, the uncontroverted evidence that Kray fired the fatal shot proved his guilt beyond a reasonable doubt. We are convinced beyond a reasonable doubt that any error in excluding testimony about the CISD sessions was harmless.

(Dkt. # 15, Exh. 4, at 8, 9, 23-32[4]).

_____

The following footnotes are from the text of the Washington Court of Appeals' decision; only the numbering has been changed for formatting purposes:

[3] A second CISD debriefing was held approximately one year later, in 1998.

_____

[4]This Court's copy of Exhibit 4 at Dkt. # 15 is missing pages 25-28; the Court referred to Exhibit 5, Appendix A for the full text of the appellate court's opinion.

REPORT AND RECOMMENDATION- 30

1
2
3

There were no written records from the debriefings. Kray asked the trial court to order the officers to draft brief summaries of the sessions and seal them for in camera review. The court refused, saying, "Well, it seems to me if there were no notes taken [during the CISD] that would be certainly a risky procedure because their memory as to what had transpired in the interim." RP at 1618.

4
5
6

[4] Firearms expert James Krylo explained the physical evidence and determined with reasonable scientific certainty that Officer Lowry's fatal chest would resulted from a 7.62 mm bullet fired by an SKS assault rifle, the type that Kray had fired. [all footnotes in the text]

7

[5] The state described the CISDs as follows:

A number of law enforcement officers were present and/or involved in the shooting that occurred on August 28, 1997 that is the subject of this trial. . .

8
9

A number of other officers and other law enforcement personnel were also involved in this due to its significance and may have also received or been part of C.I.S.D. sessions.

10
11
12
13
14

Because of the existence of the privilege the State has not inquired into specifics as to when or who were part of the C.I.S.D. sessions but it is believed that several of the SWAT team members closely involved with the shooting spoke with a counselor shortly after the shooting. It is also believed that a larger group, which is also contemplated and covered by the privilege, met for the purposes of receiving the benefit of a C.I.S.D. Several of the less directly involved officers also received the benefit of attending a C.I.S.D. session several days following the shooting to assist them with their reaction and stress. . . . .

15
16
17
18
19

It is the State's belief and understanding that the counselors involved in each of the C.I.S.D. sessions held were pre-designated by the Chief of Police. Further, that the communication by the officers to the counselor(s) was made while the counselor was acting in his/her capacity as a counselor and that the counselor(s) has received training to provide the necessary emotional and moral support to the officers. The counselors were not initial responding officers, witnesses, or parties to the incident. And finally, that the reason the officers who received the services of the C.I.S.D. session was from actions that took place while the officers were acting in their official capacities as law enforcement officers, [all footnotes in the text].

20

[6] RCW 5.60.060(6) provides:

21
22
23
24
25

(a) A peer support group counselor shall not, without consent of the law enforcement officer making the communication, be compelled to testify about any communication made to the counselor by the officer while receiving counseling. The counselor must be designated as such by the sheriff, police chief, or chief of the Washington state patrol, prior to the incident that results in counseling. The privilege only applies when the communication was made to the counselor while acting in his or her capacity as a peer support group counselor. The privilege does not apply if the counselor was an initial responding officer, a witness, or a party to the incident which prompted the delivery of peer support group counseling services to the law enforcement officer.

26

(b) For purposes of this section, "peer support group counselor" means a:

27

(i) Law enforcement officer, or civilian employee of a law enforcement agency, who has received training to provide emotional and moral support and

28

REPORT AND RECOMMENDATION- 31

counseling to an officer who needs those services as a result of an incident in which the officer was involved while acting in his or her official capacity; or

(ii) Nonemployee counselor who has been designated by the sheriff, police chief, or chief of the Washington state patrol to provide emotional and moral support and counseling to an officer who needs those services as a result of an incident in which the officer was involved while acting in his or her official capacity.

[7] Kray requested an in camera examination of each officer, but the trial court declined to conduct further interviews.

[8] The State also contends that Kray waived his claim that the trial court erred by failing to question each officer regarding the CISD, including the officers who testified before Roberts, the only officer whom the trial court examined in camera, e.g. Wolph, Still, and Kelstrup. We disagree. The trial court had already excluded mention of the CISD generally. The trial court said nothing following the in camera hearing to suggest that it might have decided differently had it examined additional officers.

[9] "It appears that there were numerous other different avenues [of discovering the information learned at the CISD session] and it's not a matter of any factual information that was not easily available and, in fact, may not have been . . . referred to or learned through other mechanisms[.]" RP at 2861-62.

[10] There was a CISD session on August 28 or 29, 1997, and another session approximately one year later.

[11] Officer Roberts learned the information that changed his mind about the shooting at the CISD meeting on August 28 or 29, 1997. The forensic information was not yet available at the earlier tactical debriefing on the day of the incident.

(Dkt. # 15, Exh. 4 8, 9, 23-31 (emphasis added)).

Mr. Kray argues that however this Court resolves this issue, it should at least examine the full record of the testimony by the officers involved and the sealed record the trial court made in its ruling on the privilege issue.  In his state court filings, Petitioner referred to the trial reporter's transcript of the *in camera* interview, which was filed under seal for purposes of appellate review. (Dkt. # 15, Exh. 2, p. 149, n. 19).  That transcript was not attached to Volume XIX of the transcript produced by Petitioner.  (*See* Dkt. # 31).  However, like the state appellate court, this Court does not find it necessary to review the scope of the CISD privilege because it finds that any inconsistencies in the officers' statements and forensic evidence was otherwise available to Mr. Kray.

"It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate

REPORT AND RECOMMENDATION- 32

due process." *Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir. 1999); *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990) (a "state court's decision to exclude certain evidence must be so prejudicial as to jeopardize the defendant's due process rights.").   To determine whether the exclusion of evidence reaches constitutional proportions, the Court considers five factors:

> (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.

*Tinsely*, 895 F.2d at 530.  The Court then "balance[s] the importance of the evidence against the state interest in exclusion." *Id.*

In this case, the balance of factors supports the state court's exclusion of the evidence.  The state court relied on RCW 5.60.060, a state statute which designates as privileged communications made by law enforcement officers engaged in counseling sessions with designated peer support counselors.  The Washington state court's detailed adjudication of the claim reveals that Mr. Kray's counsel was given ample opportunity to effectively cross-examine the officers who participated in that counseling and through that cross-examination, defense counsel was able to reveal inconsistencies in the officers' statements without mentioning the CISD sessions. (Dkt. # 15, Exh. 4, p. 31).  The excluded testimony was not the only evidence of the number of shots fired or whether the officers initially believed that Mr. Kray initially fired multiple shots.  As noted by the Washington Court of Appeals, any inconsistencies in the officers' statements about the number of shots Mr. Kray fired were largely irrelevant because the jury heard uncontroverted forensic evidence that Mr. Kray fired only one bullet from the assault rifle (the shot that killed Lowry), not multiple shots as the officers had initially believed.  (*Id.*).  The jury also heard testimony that Officer Lowry shot first.  (*Id.*).

REPORT AND RECOMMENDATION- 33

Petitioner has not demonstrated that the Washington Court of Appeals' decision regarding the exclusion of evidence of and communications made during the post-incident debriefings was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Therefore, the Court recommends that habeas relief as to Mr. Kray's fifth ground for relief be denied.

**C.      Claim Six - Denial of Confrontation - Assault of Wife - Mrs. Srip**

Mr. Kray claims that evidence was admitted at trial regarding testimonial accusations made against him by his estranged wife at a time when she was not under oath or subject to his right to confront witnesses, in violation of *Crawford v. Washington*, 541 U.S. 36 (2004).[5]  (Dkt. # 1, p. 8-9).  In addition, Mr. Kray argues that the Washington Court of Appeals inappropriately applied a harmless error test.  (Dkt. # 20, p. 24)  Respondent argues that Mr. Kray's right to confrontation is not violated where a witness takes the stand and is subject to cross-examination, but claims no recollection as to certain events.  (Dkt. # 14, p. 43-44).  Alternatively, Respondent argues that even if there was a constitutional violation, the error was harmless because two other witnesses testified that Mr. Kray pointed his assault rifle at them and threatened to shoot tires of Mrs. Srip's car.  (*Id.*)

Criminal defendants in state court trials have a Sixth Amendment right to confront the witnesses against them. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The right ensures reliability by requiring the witness to make statements under oath, requires the witness submit to cross-examination, and allows the jury to assess the witness's credibility. *California v. Green*, 399 U.S.

---

[5]The Supreme Court recently overruled the Ninth Circuit's holding in *Bockting v. Bayer*, 399 F.3d 1010, 1012 (9th Cir. 2005) that Crawford was retroactive. See *Whorton v. Bockting*, 127 S. Ct. 1173 (2007)(*Crawford* is not retroactive).  However, the parties are agreed that *Crawford* applies in Mr. Kray's case because his case became final on March 29, 2004, after *Crawford* was published (on March 8, 2004).  *See* Dkt. # 15, Exh. 9.

REPORT AND RECOMMENDATION- 34

149, 158 (1970); *Lee v. Illinois*, 476 U.S. 530, 540 (1986).

Where "testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004).   The general description of a Crawford-covered testimonial statement is that it is a formal statement to government officers performing investigative and prosecutorial functions. *Id.* at 51, 53, 68 (*e.g.,* ex parte testimony at preliminary hearing; prior testimony before a grand jury; prior testimony at an earlier trial; statements taken by police officers in the course of interrogations; prior testimony to police interrogations).

*Crawford* clarifies that the confrontation right is not violated when a witness testifies and is subject to cross examination.  The confrontation clause does not guarantee the most effective cross-examination, merely the opportunity for cross:

> [T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. . . . The Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.

*Delaware v. Fensterer*, 474 U.S. 15, 20, 21-22 (1985) (italics in the text) (emphasis added) (citations omitted).

A confrontation clause violation is subject to harmless error analysis.  *United States v. Bowman*, 215 F.3d 951, 961 (9th Cir. 2000).  "In the context of habeas petitions, the standard of review is whether a given error 'had substantial and injurious effect or influence in determining the jury's verdict'." *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Under this standard of review:

> [T]he question is, not were [the jurors] right in their judgment, regardless of the error or its effect upon the verdict.  It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision . . . . .  The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the

REPORT AND RECOMMENDATION- 35

error.  It is rather, even so, whether the error itself had substantial influence.

*Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946).

Mr. Kray objects that numerous police and security officer witnesses and others were permitted to testify about statements allegedly made by petitioner's ex-wife, Samaun Srip, under questioning.  (Dkt. # 1, p. 9).

At trial, Mrs. Srip testified and denied that Kray ever assaulted her; she also denied he assaulted her by pointing his rifle at her car and threatened to shoot her tires if she goes to work, that she was afraid of him as she left the house, that she told the security at work she was afraid to return home.  (Dkt. # 16, Exh. 18, at 3827, 3838, 3848, 3856, 3858).  Defense cross-examined her. (Dkt. # 16, Exh. 19 at 3916-3942).

The Court of Appeals considered Mr. Kray's confrontation clause claims as follows:

> Kray also argues that his right to confrontation was violated when his assault victim's hearsay statements were admitted at trial. As support for this claim of error, he relies on *Crawford v. Washington*, 541 U.S. 36 (2004).
>
> In *Crawford*, the United States Supreme Court held that the admission of a witness's testimonial, out-of-court statements violates the confrontation clause of the Sixth Amendment when the witness does not testify at trial, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness regarding the out-of-court statements. 541 U.S. at 59. The admission of hearsay statements does not violate the confrontation clause, however, if the hearsay declarant is a witness at trial, the witness is asked about the event and the hearsay statements, and the defendant is provided an opportunity for full cross-examination. *See In re Grasso*, 151 Wn.2d 1, 14-16 (2004); *State v. Clark*, 139 Wn.2d 152, 159 (1999).
>
> The witness at issue is Kray's estranged wife. Although the State called her to testify, she proved to be a hostile witness. During extensive questioning, Kray's wife denied that he had threatened her in any way at any time, and she denied telling anyone about his threatening words or actions. After the defense briefly cross examined her, the State introduced witnesses who testified about her prior statements regarding Kray's assaultive behavior.
>
> There is no need to address whether these statements were testimonial because the declarant was available to testify and was subjected to cross

REPORT AND RECOMMENDATION- 36

examination. That such cross examination was largely unnecessary, given the nature of the declarant's direct testimony, is of no consequence. The use of out-of-court statements does not violate the confrontation clause when the declarant appears for cross examination. *Clark*, 139 Wn.2d at 159.

Exhibit 11, at 4-5 (footnote omitted) (emphasis added).

The Washington Supreme Court also addressed the claim on the merits and held that there was no violation of Mr. Kray's confrontation rights:

As for the hearsay issue, *Crawford* arguably constitutes a change in the law that justifies reexamining that issue in light of the right of confrontation. But the change in law must be material to the case at hand. *Gentry,* 137 Wn.2d at 388. *Crawford* applies only to the hearsay statements of persons who are not subject to cross-examination at trial. *Crawford,* 541 U.S. at 60 n.9. Mr. Kray's wife appeared at trial and was examined. Her denial that she made the statements in question is a constitutionally permissible response. *See State* v. *Clark,* 139 Wn.2d 152, 161, 985 P.2d 377 (1999) (right of confrontation not violated when witness denied acts related in hearsay statements and asserted that her statements were lies). *Crawford* is therefore not material to Mr. Kray's case.

Moreover, even if *Crawford* applies, violation of the right of confrontation is subject to harmlessness analysis. *State* v. *Davis,* 154 Wn.2d 291, 304, 111 P.3d 844 (2005). And because this is a personal restraint petition, Mr. Kray bears the burden of demonstrating that he was actually and substantially prejudiced by constitutional error. *Lord,* 123 Wn.2d at 303. He does not do so.

(Dkt. # 15, Exh. 13, at 2-3 (emphasis added).

Mr. Kray argues that Washington and the Ninth Circuit have held that the right of cross-examination means more than simply the *opportunity* to cross-examine; the right to cross-examine must be meaningful as in *Lowery v. Collin*, 996 F.2d 770, 771-72 (5th Cir. 1993). The State must elicit the damaging testimony from the witness so as not to put the defendant in the damaging "Catch 22" position of having to elicit the damaging testimony himself or waiving his confrontation rights. (Dkt. # 20, p. 23). In this case, however, Ms. Srip was called as a witness, was examined, and testimony was elicited. She chose, however, to deny that Mr. Kray assaulted her.

In addition, there were two witnesses who testified to Mr. Kray's assault on his wife. Ra

REPORT AND RECOMMENDATION- 37

Lan testified that Mr. Kray pointed his rifle at Mrs. Srip's car tires and threatened to shoot them if she went to work and that Mrs. Srip panicked and hurriedly left. (Dkt. # 16, Exh. 20, pp. 1825, 1829).  Song Suoing testified that Mr. Kray tried to stop Mrs. Srip from leaving by threatening her with a rifle.  (Dkt. # 16, Exh. 21, pp.  1511-1512).

Under these circumstances, the jury was free to draw its own conclusion.

The Court is not aware of any United States Supreme Court case that would hold under the circumstances of this case, that a criminal defendant's Confrontation Clause rights were violated when the witness was present at trial, testified and was cross-examined, but turned out to be a hostile a witness.  In the absence of such a case, a state court's adjudication of the claim on the merits cannot be contrary to, or an unreasonable application of clearly established federal law.

Accordingly, the undersigned recommends that Mr. Kray's petition be denied on this claim.

**D.     Claim Seven - Juror Deliberation - Audio Recording**

In this claim, Mr. Kray argues that his constitutional rights were violated when the jury was allowed to listen to portions of audio tapes containing inflammatory and inadmissible hearsay which were never admitted into evidence. (Dkt. # 1, p. 9; Dkt. # 20, p. 24).  Mr. Kray contends that this violated his right to counsel and his right to be present at all critical stages of his criminal proceeding.  (*Id*.).

Where a jury rehears tapes that have already been played in open court, replaying the tapes is error because the period when the jurors listen to tapes is "properly viewed as a stage of the trial at which the presence of the defendant is required."  *See United States v. Felix-Rodriguez*, 22 F.3d 964 (9th Cir. 1994); *United States v. Brown*, 832 F.2d 128 (9th Cir. 1987); *United States v. Kupau*, 781 F.2d 740, 741-43 (9th Cir.), *cert. denied*, 479 U.S. 823 (1986); *see also* Fed.R.Crim.P. 43(a):

> The defendant shall be present at the arraignment, at the time of the plea, at every
> stage of the trial including the impaneling of the jury and the return of the verdict,

REPORT AND RECOMMENDATION- 38

and at the imposition of sentence, except as otherwise provided by this rule.

The error can be reviewed for harmlessness in replay cases. *Felix-Rodriguez*, 22 F.3d at 967 (harmless error); *Brown*, 832 F.2d at 130 (harmful error); *Kupau*, 781 F.2d at 743 (not plain error). However, allowing the jury to listen, without any guidance, to tapes that had never been presented in open court is a more grievous error not subject to harmless or plain error; but is a structural error requiring automatic reversal. *United States v. Nousfar*, 78 F.3d 1442, 1445 (9th Cir. 1996).

Mr. Kray states that the tapes included false and damning statements that he had "armed himself with rifles" and "has barricaded himself inside [a] . . . home," "made threats to shoot Auburn P.D. officers earlier," and "made threats . . . that . . . somebody was gonna die." (Dkt. # 20, p. 25, citing to trial exhibits 634 and 635[6]). Mr. Kray states that the tape also included the following comments, which Mr. Kray believes are prejudicial to Cambodians:

> I-COM: For the 14 year old son, especially. I mean, he's . . . he's just real upset about this, and I guess he's real shamed and everything now and. . . I don't know but . . .

> 911: Well, you know . . . yeah, my . . . my nephew . . . not my nephew, my brother-in-law's Cambodian and their . . . their ideas are really different from ours and . . .

> I-COM: Yeah, that's that . . . that's (unintelligible) thing, he's real embarrassed and shamed now and . . . you know.

> 911:   Yeah, well, the only way that he can . . . that he can find face now would be to shoot himself or somebody else.

> I-COM: Yeah.

> 911: Which is strange, and I . . . my brother-in-law has many times, tried to explain it to me, but I don't understand it though.

> I-COM Yeah . . . yeah, I've heard things like that too.

---

[6]The audio tapes, marked as trial exhibits 634, 635 and 319 (later referred to by Petitioner) are not part of the record before this Court. For purposes of this analysis, the Court accepts as true, the excerpts cited by Mr. Kray from the written transcripts of the audio tapes.

REPORT AND RECOMMENDATION- 39

(*Id*.).

Mr. Kray argues that permitting the jurors to listen to material included on the tapes that was not admitted at trial outside his presence and the presence of counsel constituted a structural error that cannot be considered harmless.  (Dkt. # 20, p. 26).   Although he admits that the record is "admittedly incomplete," Mr. Kray states that it is clear that the tapes his jury listened to included portions never admitted at trial.  (*Id*.)  "The Petition so alleges and the Answer does not show to the contrary.  Absent proof those things did not occur," Mr. Kray argues, he is entitled to issuance of a writ.  (*Id*.).   In support of his argument that the jury must have listened to more on the tapes than what was admitted to at trial, Mr. Kray points to the trial court's minutes as follows:

> The court minutes reflect that one of the tapes, Exhibit 319 was played on February 11 during trial for 40 minutes from 3:09 p.m. until 3:49 p.m. (SCP (Clerk's Minutes 2/11/99) (appended to brief).  At that time, the State had its witness, Charles Bissett, periodically stop the tape to explain the various speakers on the tape and their relative locations.  RP 3765-77.  The admitted portion tape therefore necessarily consisted of less than 40 minutes.
>
> The minutes reflecting the jury's deliberations, however, shows that the jury spent 50 minutes, from 1:40 p.m. to 2:30 p.m., listening to the tape, without, obviously any witness interrupting their listing [sic] of the tape. SCP (Clerk's Minutes 3/10/99) (Appendix E to this brief).

(Dkt. # 15, Exh. 2 p. 135-36).

Respondent argues that Petitioner failed to develop factual support for this claim at the trial court level even after the court invited him to do so, failed to develop factual support for the claim on direct appeal, and did not raise the claim in collateral proceedings. (Dkt. # 14, p. 57).

Prior to sentencing, Mr. Kray's counsel objected to the jury listening to portions of the tapes that were not admitted into evidence and moved for a new trial.  (Dkt. # 15, Exh. 22, p. 5315; 5326-27).  The trial court stated:

I'm satisfied from talking with my court personnel that the jury only listened to that

REPORT AND RECOMMENDATION- 40

which they had heard before. I think Ms. Lund [the prosecutor] is correct, in your closing arguments you [defense counsel] told the jury to go ahead and listen to the tape, to the gunshots. . . .I'm satisfied that they [the jury] didn't listen to anything that was not played to them during the trial as such.

(*Id.*, pp. 5330-31)

The Washington Court of Appeals addressed Mr. Kray's claim regarding the audio tapes as follows:

At the April 14, 1999 sentencing hearing, defense counsel objected that, contrary to the trial court's earlier agreement with counsel, the jury had been allowed to listen to the tapes without counsel for either side being present to ensure that the jury did not hear nonadmitted portions of the tape. The trial court investigated and reported that its court staff confirmed the jury had listened only to the portions of the tape that it had heard during trial.

Defense counsel moved for a new trial, contending that the jury had listened to matters not admitted into evidence. The trial court denied the motion, stating that it was satisfied from talking with court personnel "that the jury only listened to that which they had heard before" and that defense counsel's belief to the contrary was incorrect. RP at 5330-31.

The trial court invited defense counsel to file a motion for court staff to give sworn testimony on this issue. In addition, the court sent a letter encouraging defense counsel to request a hearing to resolve these concerns. The record does not show that Kray requested such a hearing.
. . .

### III. Juror deliberations - audio recordings

Kray contends that we should reverse his convictions because during deliberations, the jury listened to audiotapes from the trial that were supposed to have been redacted but were not. This argument fails for two reasons. First, the doctrine of invited error "prohibits a party from setting up an error at trial and then complaining of it on appeal." *In re Personal Restraint Petition of Thompson,* 141 Wn.2d 712, 723-24, 10 P.3d 380 (2000). Here, knowing that they could be available to the jury, Kray offered into evidence Exhibits 634 and 635, audiocassette tapes of conversations he had with the police. If Kray found any portion of these tapes objectionable, he could have requested or made redacted copies. He also could have prepared or requested redacted written transcripts for the jury to use. But Kray took no such action to limit the content of his exhibits. Thus, he waived his right to complain.

Second, the existing record does not support Kray's allegations of

REPORT AND RECOMMENDATION- 41

1

2     impropriety and prejudice. After objecting that both counsel were not present when

3     the jury reheard the audiotapes, defense counsel pointed out that the court clerk
      entries (regarding jury deliberations) did not indicate what portions of the tapes had
      been replayed. He asked the trial court if it had made any record as to what portions
4     of the tapes were or were not played to the jury. The trial court recounted the
      previous agreement to notify counsel if the jury was going to listen to the tapes, but
5     the court recalled that counsel had not indicated that they wanted to be present so
      long as the jury did not listen to anything inappropriate.

6
            The trial court explained that when the jury asked to hear the tapes, the court
7     instructed its judicial assistant and court reporter to be present, both of whom had
      been in court throughout the trial and knew which portions had been played in open
8     court. The court's staff reported that, during deliberations, the jury had listened to
      only the portions of the tape played during the trial.
9
            But defense counsel moved for a new trial, insisting that the jury had listened
10    to matters not admitted into evidence. The trial court denied the motion, advising
      defense counsel that he could move post trial for court staff to give sworn testimony.
11    The court later sent both parties a letter encouraging Kray to request a hearing date
      to resolve any concerns on this issue. But Kray never requested a hearing.
12
            Thus, the record confirms that court staff was present when the tapes were
13    replayed for the jury, knew what portions of the tapes were appropriate for them to
      hear, and vouched to the trial court that the jury did not hear anything during
14    deliberations that it had not heard during the trial. Kray did not accept the trial
15    court's invitation to hold a post trial hearing on this now-disputed issue and, thus, he
      waived this claim of error. Nor does he cite to any affirmative proof of jury
16    misconduct in the record. Rather, he simply alleges that the jury spent more time
      with the tapes than had been required to play them at trial and, from that fact,
17    concludes that jury misconduct must have occurred. We reject his contention.

18

19  (Dkt. # 15, Exh. 4, pp. 10-11, 32-34).

20        Petitioner has not demonstrated that the Washington Court of Appeals' decision regarding

21  the replaying of the dispatch tapes to the jury was not contrary to, or an unreasonable application of

22  clearly established federal law, as determined by the United States Supreme Court.  The Court is

23  not aware of any United States Supreme Court cases that would hold under the circumstances of
24
    this case that Mr. Kray's federal constitutional rights were violated when the record reflects that the
25
    jury had already listened to the dispatch tapes, that trial court staff were present when the tapes
26

27

28  REPORT AND RECOMMENDATION- 42

were replayed and vouched to the trial judge that the jury did not hear anything during deliberations that it had not heard during the trial.  In addition, the trial court invited defense counsel to bring post trial motions on the issue, but he failed to do so.  Therefore, Mr. Kray waived this claim of error.

Accordingly, the undersigned recommends that habeas relief as to Mr. Kray's seventh ground for relief be denied.

**E.      Request for Counsel**

There is no constitutional right to the appointment of counsel in a federal habeas corpus proceeding brought under 28 U.S.C. § 2254. If an evidentiary hearing is required, however, the Court may appoint counsel for a petitioner who qualifies under 18 U.S.C. § 3006(A)(g). Rule 8(c), 28 U.S.C. foll. § 2254. The Court may also appoint counsel at an earlier stage of the proceedings if the interest of justice so requires. Id.; 18 U.S.C. § 3006(A).

As the Court has determined that there is no need for an evidentiary hearing, Petitioner's request for the appointment of counsel is denied.

**F.      Request for Discovery**

Rule 6(a) of the Rules Governing Section 2254 Cases provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure **if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so**, but not otherwise.

*See* Rule 6(a) (emphasis added).

The determination to permit discovery during a habeas proceeding falls within the sound discretion of the district court. *Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993). "Habeas petitions are routinely decided on the basis of pleadings and examination of the state court proceedings." *Pruett v. Thompson*, 771 F. Supp. 1428, 1458 (E.D. Va 1991), aff'd. 996 F.2d 1560

REPORT AND RECOMMENDATION- 43

(4th Cir. 1993). Consequently, discovery is inappropriate for claims that can be decided on the existing state record. A federal district court should permit discovery only as it relates to those issues which will be considered in an evidentiary hearing. *Jeffries v. Blodgett*, 771 F. Supp. 1520, 1529 (W.D. Wash. 1991), *aff'd.*, 974 F.2d 1179 (9th Cir. 1992), amended, 988 F.2d 923 (9th Cir. 1993), amended, 5 F.3d 1180 (9th Cir. 1993), cert. denied, 114 S. Ct. 1295 (1994), rev'd. and remanded on other grounds, 75 F.3d 491 (9th. Cir. 1996).

As the Court has determined that there is no need for an evidentiary hearing, Petitioner's request for discovery is denied.

## V. CONCLUSION

Based on the foregoing discussion, Petitioner's habeas petition should be denied, and this action dismissed. A proposed Order of Dismissal accompanies this Report and Recommendation. No evidentiary hearing is required as the record conclusively shows that Petitioner is not entitled to relief.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **February 29, 2008** as noted in the caption.

DATED this 31st day of January, 2008.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION- 44